**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
SPREAD ENTERPRISES, INC., d/b/a OLA
BRASIL, individually and on behalf of all others
similarly situated,

                     Plaintiff,

              -against-

FIRST DATA MERCHANT SERVICES
CORPORATION, a Florida corporation, and
WELLS FARGO BANK, N.A., a foreign
corporation,

                 Defendants.
--------------------------------------------------------X

**MEMORANDUM OF**
**DECISION AND ORDER**
11-CV-4743 (ADS)(AKT)

<u>**APPEARANCES:**</u>

**Kaplan Fox & Kilsheimer, LLP**
*Attorneys for the Plaintiff*
850 Third Avenue, 14th Floor
New York, NY 10022
      By:   Frederic S. Fox, Esq., Of Counsel

**Law Office of Lawrence B. Lambert**
*Attorney for the Plaintiff*
One Datran Center, Suite 400
9100 S Dadeland Boulevard
Miami, FL 33156
      By:   Lawrence B. Lambert, Esq., Of Counsel

**Wites & Kapetan, PA**
*Attorneys for the Plaintiff*
4400 North Federal Highway
Lighthouse Point, FL 33064
      By:   Marc A. Wites, Esq., Of Counsel

**Fox Rothschild, LLP**
*Attorneys for the Defendants*
2000 Market Street, 10th Floor
Philadelphia, PA 19103
      By:   David H. Colvin, Esq.
             Scott L. Vernick, Esq.
             Oksana Gaussy Wright, Esq., Of Counsel

**Riley Warnock & Jacobson, PLC**
*Attorneys for the Defendants*
1906 West End Avenue
Nashville, TN27203
By:   John Peterson, Esq., Of Counsel

**SPATT, District Judge.**

On September 28, 2011, the Plaintiff Spread Enterprises, Inc., d/b/a Ola Brasil, individually and on behalf of all others similarly situated("Spread" or the "Plaintiff"), commenced this action against First Data Merchant Services Corporation ("FDMS"),Wells Fargo Bank, N.A. ("Wells Fargo"), and Bankcard Brokers, Inc. d/b/a CoCard Systems of South Florida, LLC ("CoCard").  Thereafter, on December 16, 2011, the Court "so ordered" the Plaintiff's notice of voluntary dismissal as to CoCard, leaving FDMS and Wells Fargo (collectively, the "Defendants") as the remaining Defendants in this action.

Also on December 16, 2011, the Plaintiffs filed an Amended Complaint.  In the Amended Complaint, the Plaintiff seeks to bring a class action and alleges that the Defendants have an "unlawful practice of overcharging merchants for certain unauthorized and extra-contractual transaction fees in connection with the process of credit card transactions."  (Amend. Compl., ¶ 1.)  In this regard, on behalf of itself and all others similarly situated, the Plaintiff brought the following four causes of action: (1) breach of contract; (2) breach of the implied duty of good faith and fair dealing; (3) in the alternative to the first two claims, unjust enrichment; and (4) violation of New York General Business Law ("NYGBL") § 349.  However, in a Memorandum of Decision and Order dated August 22, 2012, the Court dismissed the Plaintiff's claims for breach of implied duty of good faith and fair dealing; unjust enrichment and violation of NYGBL § 349.  As such, the only pending claim is the Plaintiff's breach of contract claim.

Presently before the Court is the Plaintiff's motion to certify a class pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 23. For the reasons set forth below, the Plaintiff's motion is denied.

## I. BACKGROUND

### A. The Parties

The Plaintiff Spread is a Florida corporation that operates a website called www.olabrasil.com, through which consumers use credit cards to purchase pre-paid minutes for international phone calls. The Defendant FDMS is also a Florida corporation and a credit card payment processor. The Defendant Wells Fargo is a Delaware corporation and a Member Bank of several associations for credit card transactions, such as Visa and Mastercard, and is eligible to sponsor credit card payment processors like FDMS to authorize, capture, settle and clear credit card transactions.

The Court pauses here to note that complete diversity is absent in this case, as the Plaintiff and FDMS are both citizens of the State of Florida. See Utopia Studios, Ltd. v. Earth Tech, Inc., 607 F. Supp. 2d 443, 445 (E.D.N.Y. 2009) ("It is well-settled that, for diversity jurisdiction purposes, a corporation is a citizen of the state where it is incorporated and of the state where it has its principal place of business."). Generally, in order to exercise federal subject-matter jurisdiction over a state law claim, such as the Plaintiff's breach of contract claim here, courts "require[ ] complete diversity between all plaintiffs and all defendants[.]" Manginelli v. Homeward Residential, Inc., No. 13 CV 2334(SJF)(AKT), 2013 WL 6493505, at *4 (E.D.N.Y. Dec. 9, 2013) (quoting Lincoln Property Co. v. Roche, 546 U.S. 81, 89, 126 S. Ct. 606, 163 L.Ed.2d 415 (2005)) (internal brackets omitted). In other words, "diversity jurisdiction does not exist unless each defendant is a citizen of a different State from each plaintiff."

Connecticut v. Moody's Corp., Civil No. 3:10cv546(JBA), 2011 WL 63905, at *4 (D. Conn. Jan. 5, 2011) (quoting Owen Equip. & Erection Co. V. Kroger, 437 U.S. 365, 374, 98 S. Ct. 2396, 57 L. Ed. 2d 274 (1978)).  Where there is not complete diversity between the parties, this Court lacks subject matter jurisdiction. See 28 U.S.C. § 1332(a)(1); Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 553–54, 125 S. Ct. 2611, 162 L. Ed. 2d 502 (2005) ("Incomplete diversity destroys original jurisdiction with respect to all claims.").

However, "even in the absence of complete diversity," a court may "still [have] subject matter jurisdiction over this action under the Class Action Fairness Act of 2005 ('CAFA'), Pub.L.109–2, § 5, 119 Stat. 4 (2005)."  Mattera v. Clear Channel Communications, Inc., F.R.D. 70, 77 (S.D.N.Y. 20056) (citing 28 U.S.C. § 1332(d)).  In this regard, "CAFA amended the federal diversity jurisdiction statute to confer federal jurisdiction over class actions where: (1) the proposed class contains at least 100 members (the 'numerosity' requirement); (2) minimal diversity exists between the parties, (i.e., where 'any member of a class of plaintiffs is a citizen of a State different from any defendant'); and (3) the aggregate amount in controversy exceeds $5,000,000."  Smith v. Manhattan Club Timeshare Ass'n, Inc., 944 F. Supp. 2d 244, 249 (S.D.N.Y. 2013) (quoting Purdue Pharma L.P. v. Kentucky, 704 F.3d 208, 213 (2d Cir.2013) (in turn, quoting 28 U.S.C. § 1332(d)(2)-(6))).  "There are several exceptions to the federal jurisdiction conferred by CAFA[,]" but as none of these exceptions appear to be applicable here, the Court declines to discuss them.  Id. (citing 28 U.S.C. § 1332(d)(3)-(4). "Under CAFA, as under the traditional rule, the party asserting subject matter jurisdiction has the burden of proving it."  Blockbuster, Inc. v. Galeno, 472 F.3d 53, 59 (2d Cir.2006).

Therefore, since both the Plaintiff and the Defendant FDMS are citizens of the State of Florida, federal subject matter jurisdiction shall only be retained in the event that the Plaintiff

succeeds on its motion for class certification pursuant to Fed. R. Civ. P. 23.  See, e.g.,

McGaughey v. Treistman, No. 05 Civ. 7069(HB), 2007 WL 24935, at *3 (S.DN.Y. Jan. 4, 2007)

("[The] [p]laintiff's action is no longer a class action, and this Court cannot retain subject matter

jurisdiction in diversity over Plaintiff's action pursuant to the Class Action Fairness Act.")

(citing 28 U.S.C. § 1332(d)(2)).

## B.  An Overview of FDMS's Processing Services and FDMS's Relationship with Merchants

Returning to the facts of this case, by means of business relationships that FDMS has

formed with Member Banks, such as Wells Fargo, FDMS affords Merchants like the Plaintiff

with the ability to accept credit card payments from their customers.  Specifically, FDMS

facilitates the process by which a consumer pays for a good or service via credit card.  To this

end, FDMS enters into contracts with different Merchants by which it agrees to perform several

processing functions for the Merchant, such as the authorization, batching, clearing and

settlement functions of a credit card transaction.

FDMS provides these processing services for approximately six million Merchant

locations, thousands of card issuers and millions of consumers all over the world.  For example,

in 2011, FDMS processed fifty-six billion transactions at 6.2 million merchant locations, earned

gross revenues of $10.7 billion and employed 24,000 people.

In general, actual credit card transactions involve several communications between the

Merchant's bank and the bank that issued the credit card that is used by the customer in the

transaction (the "Issuing Bank").  This includes, as suggested above, authorization, batching,

clearing and settlement.  All of these communications are facilitated by FDMS, as the credit card

processor.

"Authorization" is a processing service provided by FDMS by which a Merchant requests confirmation that a consumer has available credit to complete a transaction. During this process, the Merchant's bank confirms with the Issuing Bank (1) the credit card number used by the consumer; (2) the validity of the credit card; and (3) the availability of funds. If the Issuing Bank approves authorization, the Issuing Bank reserves the funds needed to pay the Merchant's bank, but transmits an approval to the Merchant's bank without any funds.

FDMS also offers Merchants a processing service called "Address Verification Service" ("AVS"), which is considered a sub-function of the Authorization service and is done for security purposes. In this regard, a Merchant's AVS request typically accompanies an Authorization request and directs FDMS to confirm that a customer using a credit card has entered the correct billing address. In general, an AVS is performed for either mail order or telephone order ("MOTO") transactions or for purchases made over the internet ("eCommerce").

"Batching" refers to the practice by a Merchant's bank of storing the authorizations it receives in a daily "batch," which it then submits through FDMS to the Issuing Bank at the end of each day for settlement. "Clearing" and "settlement" involves the Issuing Bank paying the Merchant's bank for the transaction, less the associated fees. Payment is then delivered from the Merchant's bank to the Merchant in the amount of the customer's charge, again less applicable fees.

However, a Merchant can submit a number of different kinds of processing service requests to FDMS, and not all of these requests involve FDMS performing an Authorization or an AVS. In this regard, in its Global Gateway API User Manual, FDMS identifies the types of processing service requests a Merchant can make as follows: (1) "[a] Sale transaction," which "is a credit card transaction that immediately charges a customer's credit card"; (2) an "Authorize

Only" transaction, which is "[a] credit card transaction that reserves funds on a customer's credit card," but "does not charge the customer until [the Merchant] performs a Ticket Only transaction and confirms shipment of the order"; (3) "[a] Ticket Only transaction," which "is a post-authorization transaction that captures the funds from an Authorize Only transaction, reserving funds on the customer's card for the amount specified"; (4) "[a] Forced Ticket transaction," which "is a credit card transaction used similarly to a Ticket Only transaction, except it is specifically for authorizations obtained over the phone"; (5) "[a] return transaction," which "returns funds to a customer's credit card for an existing order on the system"; (6) "[a] credit transaction," which "returns funds to a customer's credit card for orders where [the Merchant] [does] not have an order number"; and (7) "[a] void transaction," which "cancels the transaction." (Pl. Mot., Exh. 10.) Of these processing transaction requests, only the Sale transaction and the Authorize only transaction require FDMS to perform an Authorization or an AVS.

As suggested, some of the credit card Sale transaction requests which FDMS process occur in eCommerce. In those cases, a Merchant first submits the Sale transaction request by means of a payment "gateway" to one of FDMS's four front-end "platforms," which are computer network and software systems used by FDMS to process credit card transaction requests made by its merchant-clients. A gateway creates electronic instructions for processing and conveys those instructions to FDMS. In addition, a gateway translates, decrypts and encrypts transaction data so as to ensure that Merchants are in compliance with industry standards for data security. Each gateway has individualized features, functionality, computer architecture, file formats and methods of communicating with payment processors. The

combination of a gateway's features and the decisions made by a Merchant may impact the way a Merchant submits his processing requests to FDMS.

Once a Sale transaction request is transmitted from the gateway to one of FDMS's platforms, the platform submits the Sale transaction request through the respective association, such as Mastercard or Visa, to the Issuing Bank. Upon receiving the Sale transaction request from FDMS, the Issuing Bank either authorizes or declines it. In the event it authorizes the Sale transaction request, the Issuing Bank notifies FDMS and reserves the necessary funds on the customer's credit card to cover the proposed amount of the Sale transaction. FDMS then advises the Merchant that the Sale transaction was authorized. If the Sale transaction is authorized and completed, the Merchant instructs FDMS to "capture" the transaction, thereby confirming that the reserved funds should be set aside in the consumer's credit card account for payment to the Merchant . As such, the customer's credit card is charged. Importantly, for an approved Sale transaction request, the authorization and the capture happen simultaneously. However, if the Sale transaction request is declined, the Issuing Bank returns the Sale transaction request to FDMS without payment and FDMS notifies the Merchant that the Sale transaction request was declined.

Authorization Only transaction requests are processed in a similar manner as Sale transaction requests, except that there is a delay between the authorization and capture parts of the transaction. For example, a Merchant may choose not to charge a customer's credit card until it ships the goods to the customer. Thus, the Merchant first submits the Authorization Only request in order to reserve the necessary funds in the customer's credit card account and then later submits a Ticket Only transaction request to capture the amount reserved on the credit card.

Accordingly, a Ticket Only transaction does not require FDMS to carry out a second authorization.

In exchange for performing the services described above, Merchants agree to pay FDMS various fees, including Authorization and Capture Transaction fees. The Authorization and Capture Transaction fees are paid by the Merchant to the Issuing Bank and are typically a fixed amount as opposed to a percentage of the transaction amount. In this regard, the Issuing Bank deducts Authorization and Capture Transaction fees from the amount it pays the Merchant's bank for the transaction. Apparently, according to the Plaintiff, in any given months, these fees, on average, are charged to the Merchant for approximately 115 percent of the Merchant's completed Sale transactions. In other words, if a Merchant completes 100 Sale transactions in a month, it should expect to be charged about 115 Authorization and Capture Transaction fees for that same month. Of note, the Merchant will be charged fees for its transaction requests, even if said requests ultimately get declined.

According to the Plaintiff, depending on which of FDMS's platforms a Merchant decided to use, FDMS would charge Authorization and Capture Transaction fees and AVS fees even when the Merchant submitted a Ticket Only, Void, Return or Credit transaction request that did not require FDMS to perform either an Authorization or an AVS. Specifically, the Plaintiff alleges that FDMS's Omaha Front-End Platform (the "Omaha Platform") charged Merchants Authorization and Capture Transaction fees and AVS fees for every communication or transaction request they submitted, whereas FDMS's Nashville Front-End Platform (the "Nashville Platform") only billed Merchants for these fees if the Merchant's request sought either an Authorization or an AVS.

Concerning how the Defendants obtain their merchant-clients, FDMS and Wells Fargo often work with independent companies referred to as "Independent Sale Organizations" ("ISOs"). In this regard, FDMS supports hundreds of ISOs. FDMS authorizes these ISOs to finds Merchants to enter into contracts for FDMS's credit card processing services. For Merchants, the ISOs select payment processors; negotiate pricing with payment processors; choose processing platforms; provide training on how to present items for processing; monitor the merchant's processing for fraud and other events; handle a broad array of customer service functions; and offer their own unique software systems that perform processing activities, including technical interfaces for sending processing requests to FDMS's platforms. The ISOs also submit applications on behalf of the Merchants to FDMS for approval. Those applications approved by FDMS end up forming the contract between the Merchant, FDMS and the Member Bank. In exchange for its services, the ISO receives a percentage of the Transaction Fees.

Therefore, a business relationship between a Merchant and FDMS commences when the Merchant executes a document formatted as both an application and a contract. This document is generally entitled "Merchant Processing Application and Agreement" ( "Merchant Processing Agreement"). Merchant Processing Agreements which involve FDMS frequently share common or similar provisions, but nevertheless come in different versions. As such, Merchant Processing Agreements can vary concerning whether FDMS is named as a party; whether certain fees are charged; the terms used for describing the billing of said fees; and the schedules, program guides and/or other contract documents that they have incorporated. ISOs also work with Merchants to modify Merchant Processing Agreements either by correspondence or by notices issued by the ISO or FDMS. As stated above, once executed by the Merchant, the Merchant Processing Agreement only becomes valid if and when it is accepted by FDMS.

## C. The Business Relationship Between the Defendants and the Plaintiff

On June 6, 2008, the Plaintiff entered into a Merchant Purchasing Agreement with the Defendants (the "Subject Agreement"). In this regard, CoCard, an ISO, arranged for the Plaintiff to enter into the Subject Agreement with the Defendants so as to enable the Plaintiff to accept credit card payments on its www.olabrasil.com website. CoCard and the Plaintiff have a long-standing business relationship, which pre-dates the Plaintiff's relationship with the Defendants.

The Subject Agreement directs the Plaintiff to FDMS's website for the purpose of accessing the "Program Guide," which is incorporated into the Subject Agreement by its terms. The Plaintiff did not participate in drafting the Subject Agreement. The Plaintiff was also not provided with the Program Guide prior to signing the Subject Agreement and, at the time, the Program Guide was apparently not accessible on FDMS's website.

Section 9 of the Subject Agreement provides that the Plaintiff will pay "Authorization and Capture Transaction Fees." In this regard, the Subject Agreement lists the Authorization and Capture Fee as $0.20 per item. Section 9 also provides that the Plaintiff will pay a Voice Authorization fee of $0.95 per item; an Electronic AVS Fee of $0.05 per item; a Voice AVS Fee of $1.50 per item; an Automated Response Unit ("ARU") Fee of $0.65 per item; a Chargeback Fee of $15 per item; a Retrieval Fee of $15 per item; a Minimum Monthly Fee of $0.25; a Monthly Statement Fee of $10 and an Early Termination Fee of $300. Neither the Subject Agreement, the Program Guide or any other FDMS document defines the term "per item" and the parties dispute its meaning.

Purportedly, these above-mentioned fees were determined by CoCard and not by the Defendants. In this regard, on or about September 29, 2006, the Defendants and CoCard entered into a Marketing Agreement. The Marketing Agreement was thereafter amended by means of an

Extension Amendment entered into by the Defendants and CoCard on or about January 28, 2009. In the Marketing Agreement, as amended, CoCard agreed to pay FDMS $0.02 for each authorization attempt submitted by its merchant-clients to FDMS. Thus, with respect to the Plaintiff, CoCard was paid the $0.20 Authorization and Capture Transaction fee from the Plaintiff, less the $0.02 fee that was paid to FDMS pursuant to the Marketing Agreement. Similarly, the Marketing Agreement, as amended, provided that CoCard would pay FDMS $0.01 for every electronic AVS performed by FDMS for CoCard's merchant-clients, thereby leaving CoCard with the remaining $0.04 from the $0.05 Electronic AVS fee paid by the Plaintiff under the Subject Agreement.

As to the Program Guide, it contains several "General Terms" indicating that FDMS retains sole and exclusive discretion to charge its merchant-clients for additional undisclosed and unenumerated transaction fees and to unilaterally increase other fees and charges payable by the Merchants. It states "[a]ll authorization fees will be charged for each transaction that you attempt to authorize" and "[a]ll capture fees will be charged for each transaction that you transmit to us for settlement." (Pl. Mot., Exh. 6, ¶ 17.2.) However, neither the Program Guide nor the Subject Agreement provide definitions for "authorization fees" or "capture fees," either in addition to or in contrast to the "Authorization and Capture Transaction Fee" set forth in Section 9 of the Subject Agreement. In fact, no other "authorization fees" or "capture fees" are included in the Program Guide or Subject Agreement outside of the Authorization and Capture Transaction Fee enumerated in Section 9.

In addition, although not included among the provisions of the Subject Agreement, the Program Guide states that the Subject Agreement has a three-year term, In this regard, if the Plaintiff attempted to terminate the Subject Agreement during the three-year term, with limited

exceptions, FDMS would charge the Plaintiff with the $300 Early Termination Fee and was authorized to retain funds otherwise payable to the Plaintiff in a "Reserve Account." According to the Program Guide, FDMS was permitted to establish the Reserve Account unilaterally by withholding funds owed to the Plaintiff for transactions processed by FDMS. Lastly, the Program Guide states that all legal disputes between the parties should be governed by New York law and that the venue for any such lawsuit would lie in the Eastern District of New York.

CoCard and the Plaintiff made the decision to have the Plaintiff submit its processing requests to FDMS's Omaha Platform, because it had certain benefits not available on FDMS's other three front-end platforms. CoCard and the Plaintiff also decided that the Plaintiff would use a third-party gateway to submit its processing requests to FDMS.

In this regard, the Plaintiff chose not to rely on FDMS to submit the electronic instructions that direct processing activity and, therefore, impact the fees charged. Instead, the Plaintiff turned to Authorize.net, a payment gateway, to provide this service. Authorize.net is certified to submit transactions to FDMS on the Omaha Platform and the Nashville Platform. The Plaintiff was warned that the use of a third-party gateway creates a risk concerning the fees that are charged.

A little less than a year after entering into the Subject Agreement, on May 28, 2009, the Plaintiff altered the way in which it submitted its requests for processing by FDMS. In this regard, prior to May 28, 2009, the Plaintiff generally submitted Sale transaction requests for processing. In the three months leading up to May 28, 2009, the Plaintiff's ratio of Authorization and Capture Transaction fees billed to complete Sale transactions was 122 percent for February of 2009; 122 percent for March of 2009 and 120 percent for April of 2009. This

averaged to a ratio of Authorization and Capture Transaction fees billed to complete sales of 121 percent for the three month period.

However, on May 29, 2009, the Plaintiff purchased an Advanced Fraud Detection Suite from Authorize.net, which automatically submitted separate Authorization Only transaction requests and Ticket Only transaction requests instead of Sale transaction requests.  By automatically sending the Authorization Only transaction request followed later by a Ticket Only transaction request, the Advanced Fraud Detection Suite circumvents potential fraud in that it permits a Merchant to terminate a transaction before posting a charge to a customer's account. As such, the Advanced Fraud Detection Suite altered the type and amount of requests that the Plaintiff submitted to FDMS for processing and the Plaintiff's ratio of Authorization and Capture Transaction fees billed to complete Sale transactions rose to more than 200 percent.

Approximately fifteen months after purchasing the Advanced Fraud Detection Suite, in October of 2010, the Plaintiff finally contacted Robert Cohen ("Cohen"), the CoCard representative who had enrolled the Plaintiff with FDMS.  The Plaintiff informed Cohen about the increase in the amount of fees it was being charged and suggested that it was being overcharged by the Defendants.

Of note, during the fifteen-month period between when the Plaintiff purchased the Advanced Fraud Detection Suite and when the Plaintiff contacted Cohen, the Plaintiff received monthly billing statements which revealed the increase in the Authorization and Capture Transaction fees.  Further, while he did not regularly review the monthly billing statements, Marelo Andrade ("Andrade"), the Plaintiff's principal, admitted that he had the opportunity to do so if he chose; that he understood the statements on those occasions when he did review them; and that he could ask CoCard questions regarding his statements.  In addition, according to the

Program Guide, disputes of any charges must be made in writing within forty-five days of receiving a monthly statement.

Cohen contacted Shedrick Triplett ("Triplett"), an employee of FDMS, who informed him, by email dated October 21, 2010, that the additional Authorization and Capture Transaction fee charges was due to the Plaintiff using Authorize.net as its gateway in combination with its use of the Omaha Platform. He suggested that the Plaintiff begin processing on the Nashville Platform. Triplett also informed Cohen that the Plaintiff would not receive any reimbursement for any previous charges.

Thus, the Plaintiff decided to move from using FDMS's Omaha Platform to using FDMS's Nashville Platform. Unlike the Omaha Platform, the Nashville Platform did not bill the Plaintiff for every request it submitted, but instead only charged Authorization and Capture Transaction fees and AVS fees when the Plaintiff's request resulted in FDMS performing an Authorization or an AVS for the Merchant. After making the switch, the Plaintiff's ratio of Authorization and Capture Transaction fees billed to complete Sale transactions dipped to 122 percent in November of 2010 and 120 percent for December of 2010, and then only rose slightly to 124 percent for January of 2011. Thus, the average ratio of Authorization and Capture Transaction fees billed to completed Sale transactions was 122 percent for this three month period.

By letter dated December 9, 2010, Mark Jurke ("Jurke"), one of FDMS's Directors, informed Andrade that all Authorization and Capture Transaction fees that the Plaintiff had been charged by FDMS had been proper under the terms of the Subject Agreement and the Program Guide. In this regard, Jurke explained that the Plaintiff submitted separate transaction requests

for Authorization and for Settlement and that the Subject Agreement disclosed that the Plaintiff would be charged a separate fee amount for each of these items.

However, internally, FDMS's employees exchanged a series of emails concerning the "overcharging" or "double-billing" that occurred when Merchants like the Plaintiff processed on the Omaha Platform as opposed to the Nashville Platform, particularly if those Merchants were using Authorize.net as their gateway. They suggested potential solutions such as moving Merchants who experienced this problem to the Nashville Platform or updating the code on the Omaha Platform.

**D.  The Plaintiff's Class Action Lawsuit**

Based on the foregoing, the Plaintiff alleges that the Omaha Platform caused FDMS to overcharge the Plaintiff fees by more than $20,000. The Plaintiff further alleges that other merchant-clients who have contracted with FDMS and who have their request processed on the Omaha Platform have similarly been overcharged due to FDMS charging multiple fees per credit card transaction. In this regard, the Plaintiff claims that through the Omaha Platform, FDMS charged it and other Merchants multiple Authorization and Capture Transaction fees for each transaction request instead of a single fee for a completed Sales transaction. According to the Plaintiff, FDMS deducted these extra fees automatically from the bank accounts of the Plaintiff and other Merchants.

Although the monetary amount of the alleged extra fees are very small monetarily, the Plaintiff contends that in the aggregate, based on the millions of transactions FDMS process each day, FDMS generates thousands of dollars from these fees each day. In addition, the Plaintiff estimates that more than 30,000 Merchants have been impacted by FDMS's purported overcharging.

Therefore, the Plaintiff seeks to assert a breach of contract claim on behalf of a class pursuant to Fed. R. Civ. P. 23. The Plaintiff proposes four subclasses, as follows:

> Ticket Only SubClass 1: All Merchants nationwide who were parties to a [Merchant Processing Agreement] with FDMS from September 28, 2005 to June 20, 2012, that provided for the assessment of Authorization and/or AVS Fees, who submitted transactions to FDMS'[s] Omaha [ ] Platform and were charged Auth[orization and Capture Transaction] Fees in connection with Ticket Only transactions.

> Ticket Only SubClass 2: All Merchants nationwide who were parties to a [Merchant Processing Agreement] with FDMS and Wells Fargo from September 28, 2005 to June 20, 2012, that provided for the assessment of Authorization and/or AVS Fees, who submitted transactions to FDMS'[s] Omaha [ ] Platform and were charged Auth[orization and Capture Transaction] Fees in connection with Ticket Only transactions.

> Contested SubClass 1: All Merchants nationwide who were parties to a [Merchant Processing Agreement] with FDMS from September 28, 2005 to the present that provided for the assessment of Authorization and/or AVS Fees, who submitted transactions to FDMS'[s] Omaha [ ] Platform and were charged excessive fees, including (a) Auth[orization and Capture Transaction] Fees for Return, Void Sales, Void Return, and/or Void Ticket Only transactions and (b) AVS Fees in connection with Return, Ticket Only, Void Sales, Void Return, and Void Ticket Only transactions.

> Contested SubClass 2: All Merchants nationwide who were parties to a [Merchant Processing Agreement] with FDMS and Wells Fargo from September 28, 2005 to the present that provided for the assessment of Authorization and/or AVS Fees, who submitted transactions to FDMS'[s] Omaha [ ] Platform and were charged excessive fees, including (a) Auth[orization and Capture Transaction] Fees for Return, Void sales, Void Return, and/or Void Ticket Only transactions and (b) AVS Fees in connection with Return, Ticket Only, Void Sales, Void Return, and Void Ticket Only transactions.

(Pl. Mem., pg. 21–22.)  However, in its reply, the Plaintiff has agreed to modify Contested

SubClass 1 and Contested SubClass 2 to eliminate the phrase "excessive fees, including," in the

event the Court deems it necessary.

## II.  DISCUSSION

### A. Legal Standard for Class Certification

Before certifying a putative class, the Court must determine (1) whether the class meets

the four Rule 23(a) requirements of numerosity, commonality, typicality and adequacy; and if so,

(2) whether the class satisfies one of the three categories listed in Rule 23(b).  See Brown v.

Kelly, 609 F.3d 467, 476 (2d Cir. 2010); Teamsters Local 445 Freight Div. Pension Fund v.

Bombardier, Inc., 546 F.3d 196, 202 (2d Cir. 2008); City of Livonia Employees' Ret. Sys. v.

Wyeth, 284 F.R.D. 17, 176–77 (S.D.N.Y. 2012).  "The party seeking class certification bears the

burden of establishing by a preponderance of the evidence that each of Rule 23's requirements

has been met."  Myers v. Hertz Corp., 624 F.3d 537, 547 (2d Cir. 2010).

As the Supreme Court has observed:

> Rule 23 does not set forth a mere pleading standard. A party
> seeking class certification must affirmatively demonstrate his
> compliance with the Rule--that is, he must be prepared to prove
> that there are in fact sufficiently numerous parties, common
> questions of law or fact, etc . . . [S]ometimes it may be necessary
> for the court to probe behind the pleadings before coming to rest
> on the certification question, and [] certification is proper only if
> the trial court is satisfied, after a rigorous analysis, that the
> prerequisites of Rule 23(a) have been satisfied.  Frequently that
> rigorous analysis will entail some overlap with the merits of the
> plaintiff's underlying claim. That cannot be helped.

Wal-Mart Stores, Inc. v. Dukes, __ U.S. __, __, 131 S. Ct. 2541, 2551, 180 L. Ed. 2d 374, 390

(2011) (citations and internal quotation marks omitted); see also Secs. Litig. v. Gen. Reinsurance

Corp. (In re Am. Int'l Group Inc.), 689 F.3d 229, 237 (2d Cir. 2012); Oakley v. Verizon

Comm'ns., Inc., No. 09 Civ. 9175(CM), 2012 WL 335657, at *12 (S.D.N.Y. Feb. 1, 2012) (holding that while "[t]he certifying court should not make any factual findings or merits determinations that are not necessary to the Rule 23 analysis, . . . where merits issues cannot be avoided they must be addressed"). Thus, "the United States Supreme Court has made it clear that courts cannot certify classes where Rule 23 requirements are not met, and should not contort the requirements in order to certify." Oakley, 2012 WL 335657, at *12.

However, in deciding certification, courts must still take a liberal rather than a restrictive approach in determining whether the plaintiff satisfies Rule 23's requirements and may exercise broad discretion when determining whether to certify a class. See Flores v. Anjost Corp., 284 F.R.D. 112, 122 (S.D.N.Y. 2012); Pecere v. Empire Blue Cross and Blue Shield, 194 F.R.D. 66, 69 (E.D.N.Y. 2000). Further, "[t]he dispositive question is not whether the plaintiff has stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." Kowalski v. YellowPages.com, LLC, 10 Civ. 7318 (PGG),2012 WL 1097350, at *12 (S.D.N.Y. Mar. 31, 2012) (quoting Lewis Tree Service, Inc. v. Lucent Technologies, 211 F.R.D. 228, 231 (S.D.N.Y. 2002).

## 1. The Rule 23(a) Requirements

As stated above, to qualify for class certification, the Plaintiff must first prove that the putative class meets the four threshold requirements of Rule 23(a). These requirements are as follows:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a)(1)–(4); see also Salim Shahriar v. Smith & Wollensky Rest. Group, Inc., 659 F.3d 234, 251 (2d Cir. 2011).

### a. Numerosity

Rule 23(a)(1), known as the numerosity requirement, requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "Impracticable," in this context, does not mean impossible; instead Rule 23(a)(1) only requires that, in the absence of a class action, joinder would be "simply difficult or inconvenient." Russo v. CVS Pharm., Inc., 201 F.R.D. 291, 294 (D. Conn. 2001); see also Robidoux v. Celani, 987 F.2d 931, 935 (2d Cir. 1993).

"There is no magic minimum number that will breathe life into a class, but generally, courts will find a class sufficiently numerous when it comprises forty or more members." Russo, 201 F.R.D. at 294 (citations and internal quotation marks omitted). "As plaintiff bears the burden of demonstrating numerosity, he must show some evidence of or reasonably estimate the number of class members." Id. at 295. Therefore, while "evidence of exact size or identity of class members is not required," a plaintiff cannot rely on "pure speculation or bare allegations" in order to demonstrate numerosity. Flores, 284 F.R.D. at 123 (citations and internal quotation marks omitted).

However, "in assessing numerosity[,] a court may [also] make common sense assumptions without the need for precise quantification of the class." Russo, 201 F.R.D. at 294; see also Flores, 284 F.R.D. at 123. In addition, particularly when a class is not obviously numerous, the Court should consider the following factors: "judicial economy arising from the avoidance of a multiplicity of actions, geographic dispersion of class members, financial resources of class members, the ability of claimants to institute individual suits, and requests for

prospective injunctive relief which would involve future class members." Robidoux, 987 F.2d at 936; see also Pecere, 194 F.R.D. at 70; Martin v. Shell Oil Co., 198 F.R.D. 589, 590 (D. Conn. 2000).

### b. Commonality

"To satisfy the commonality requirement of Rule 23(a)(2), there must be 'a showing that common issues of fact or law exist and that they affect all class members.'" Kowalski, 2012 WL 1097350, at *13 (quoting Leone v. Ashwood Fin., Inc., 257 F.R.D. 343, 351 (E.D.N.Y. 2009)). However, the individual circumstances of the class members can differ without precluding class certification, so long as "the common questions are at the core of the cause of action alleged." Vengurlekar v. Silverline Techs., Ltd., 220 F.R.D. 222, 227 (S.D.N.Y. 2003); see also Kowalski, 2012 WL 1097350, at *13 (holding that "[t]he commonality standard does not mandate that the claims of the lead plaintiff be identical to those of all other plaintiffs" but does "require[ ] that plaintiffs identify some unifying thread among the members' claims that warrants class treatment") (citations and internal quotation marks omitted).

In its 2011 decision in Wal-Mart Stores Inc. v. Dukes, the Supreme Court held that "[c]ommonality requires the plaintiff to demonstrate that the class members have suffered the same injury," as opposed to simply "suffer[ing] a violation of the same provision of law." Dukes, 131 S. Ct. at 2551. In other words, "[t]heir claims must depend upon a common contention . . . that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Id. at 2551. Thus, "[w]hat really matters to class certification . . . is not the raising of common questions – even in droves – but, rather the capacity of a classwide proceeding to

generate common answers apt to drive the resolution of the litigation." Id. at 2551 (citations and internal question marks omitted) (emphasis in original); see also Flores, 284 F.R.D. at 125.

### c. Typicality

Rule 23(a)(3) requires that "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." Robidoux, 987 F.2d at 936. Known as the typicality requirement, this provision is meant to ensure that the class representative is not subject to a unique defense which could potentially become the focus of the litigation. Vengurlekar, 220 F.R.D. at 227. However, "[w]hen it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." Robidoux, 987 F.2d at 936–937; see also Vengurlekar, 220 F.R.D. at 227 (holding that "the mere existence of individualized factual questions with respect to the class representative's claim will not bar class certification") (citations and internal quotation marks omitted).

### d. Adequacy of Representation

Rule 23(a)(4)'s adequacy of representation requirement requires that a plaintiff "also show that the proposed action will fairly and adequately protect the interests of the class," Vengurlekar, 220 F.R.D. at 227, and "serves to uncover conflicts of interest between names parties and the class they seek to represent," Wyeth, 284 F.R.D. at 179. See Vengurlekar, 220 F.R.D. at 227 ("The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent.") (citation omitted).

In order to satisfy Rule 23(a)(4), a "plaintiff[ ] first must demonstrate that class counsel is qualified, experienced, and generally able to conduct the litigation." Id. (citations and internal

quotation marks omitted).  Second, a plaintiff must "show that [he has] no interests that are antagonistic to the proposed class members."  <u>Id.</u>

### 2. The Rule 23(b)(3) Requirements

As indicated above, once a plaintiff satisfies the four Rule 23(a) requirements, she must also prove that the putative class is maintainable under at least one of the three categories enumerated in Rule 23(b). <u>See</u> <u>In re Visa Check</u>, 280 F.3d at 133.  In this case, the Plaintiff seeks class certification under Rule 23(b)(3).  A putative class is maintainable under Rule 23(b)(3) when "the court finds that questions of law or fact common to the members of the class predominate over any questions affecting only individual members and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).  <u>See</u> <u>In re Am. Int'l Group Inc.</u>, 689 F.3d at 239.  As set forth below, the Court finds that the Plaintiff has met the Rule 23(b)(3) requirements.

### a. Predominance

Rule 23(b)(3)'s predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation" in order to "ensure that the class will be certified only when it would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results."  <u>Myers</u>, 624 F.3d at 547 (citations and internal quotation marks and alterations omitted).  Thus, while the commonality requirement of Rule 23(a)(2) mandates that common questions of law or fact exist among the putative class members, the predominance requirement of Rule 23(b)(3) is more stringent and requires that such common questions be the focus of the litigation.  <u>See</u> <u>Continental Orthopedic Appliances, Inc. v. Health Insurance Plan of Greater New York, Inc.</u>, 198 F.R.D. 41, 44 (E.D.N.Y. 2000).  Accordingly,

"the requirement is satisfied if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." Myers, 624 F.3d at 547 (citations and internal quotation marks omitted).

### b. Superiority

"The second prong of Rule 23(b)(3), commonly referred to as the superiority element, requires the court to examine whether a class action is superior to other methods of adjudication." See Vengurlekar, 220 F.R.D. at 228. Four factors the Court should consider in determining whether a class action is the superior method of adjudicating a putative class' claim are provided in Rule 23(b)(3) as follows:

> (A) the interest of the members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the difficulties likely to be encountered in the management of a class action.

Fed. R. Civ. P. 23(b)(3). See also Oakley, 2012 WL 335657, at *18.

## B. As to Whether Contested SubClass 1 and Contested SubClass 2 are Impermissible Fail-Safe Classes

The Defendants first argue that the Plaintiff's Contested SubClass 1 and Contested SubClass 2 are impermissible fail-safe classes. In this regard, the Defendants point to the use of the language "excessive fees" in the proposed definitions for these subclasses, since it injects an assumption of liability into the subclass definitions. The Court agrees.

"A fail-safe class is one whose definition 'shields the putative class members from receiving an adverse judgment . . . .'" Mazzei v. Money Store, 288 F.R.D. 45, 55 (S.D.N.Y. 2012) (quoting Randleman v. Fidelity Nat'l Title Ins. Co., 646 F.3d 347, 352 (6th Cir. 2011)). In

other words, "[i]n a fail-safe class, either the class members win or, by virtue of losing, they are not in the class, and therefore not bound by the judgment."  Id.; see also Kamar v. Radio Shack Corp., 375 F. App'x 734, 736 (9th Cir. 2010) ("The fail-safe appellation is simply a way of labeling the obvious problems that exist when the class itself is defined in a way that precludes membership unless the liability of the defendant is established.").  Accordingly, "[a] proposed 'fail-safe' class should not be certified because it is unfair to defendants, it prevents an adverse judgment being entered against plaintiffs, and it is unmanageable because the members of the class could only be known after a determination of liability."  Mazzei, 288 F.R.D. at 55.

In this case, the Plaintiff's definitions for both Contested SubClass 1 and Contested SubClass 2 state that the class members "were charged excessive fees."  In the Court's view, this language makes these subclasses impermissible fail-safe classes, since class membership would depend on whether or not the Defendants were found liable for overcharging.

Instructive is the court's decision in Mazzei v. Money Store, a case in which the court considered the following class definition: "All similarly situated borrowers who signed form loan mortgage agreements . . . on loans which were owned or serviced by [the defendants] and who from March 1, 2000 to the present ("Class Period") were charged the following fees *that were not permitted under the [form loan agreements]*." 288 F.R.D. at 55 (emphasis, brackets and ellipse in the original).  The Mazzei court held that "[d]efining the class to include only those who were charged fees 'that were not permitted' results in a fail-safe class" because "[t]he merits of [the plaintiff's] claim depend[ed] on whether the fees 'were not permitted,'" and therefore, "if the trier of fact decided that any or all of the fees were permitted under the form loan agreements, there would immediately be no members of the class for those fees."  Id.

The Court finds that the reasoning from <u>Mazzei</u> is applicable here. Specifically, the Plaintiff proposes class definitions for Contested SubClass 1 and Contested SubClass 2 that turn on whether the fees that the Merchants were being charged by the Defendants were excessive rather than on whether the Merchants were simply being charged a particular fee regardless of whether it was excessive. In this way, the proposed class definitions for these subclasses are not neutral in that they already presuppose that the subject fees were excessive, despite the fact that the Defendants dispute this allegation. Indeed, a question at the center of the Plaintiff's breach of contract claim is whether the fees that the Defendants were charging Merchants were in excess of what was agreed upon in the Merchant Processing Agreements. As a result, for example, if a jury determined that the fees at issue were not excessive under the terms of the Merchant Processing Agreements, then there would no longer be any members of Contested SubClass 1 or Contested SubClass 2, because a Merchant's membership in these subclasses relies upon the fees being excessive and not on whether they were charged the fees at issue.

With that being said, "courts have the discretion 'to. . . redefine the class to bring it within the scope of Rule 23[.]'" <u>Id.</u> (quoting <u>Cokely v. N.Y. Convention Ctr. Operating Corp.</u>, No. 00 Civ. 4637(CBM), 2004 WL 1152531, at *2 n.3 (S.D.N.Y. May 21, 2004)); <u>see also</u> <u>Brooklyn Ctr. for Independence of the Disabled v. Bloomberg</u>, 287 F.R.D. 240, 250 (S.D.N.Y. 2012) ("Under rule 23, district courts have the power to amend class definitions or decertify classes as necessary . . . . 'In fact, the court has a duty to ensure that the class is properly constituted and has broad discretion to modify the class definition as appropriate to provide the necessary precision.'") (quoting <u>Morangelli v. Chemed Corp.</u>, 275 F.R.D. 99, 114 (E.D.N.Y. 2011)). Therefore, the Court modifies the definitions for Contested SubClass 1 and Contested

SubClass 2 and removes the offending language "excessive fees, including," thereby resolving

the fail-safe problem. See Mazzei, 288 F.R.D. at 55–56.

In this regard, the definitions for Contested SubClass 1 and Contested SubClass 2 shall

now read as follows:

> Contested SubClass 1: All Merchants nationwide who
> were parties to a Merchant Processing Agreement with FDMS
> from September 28, 2005 to the present that provided for the
> assessment of Authorization and/or AVS Fees, who submitted
> transactions to FDMS's Omaha Platform and were charged (a)
> Authorization and Capture Transaction Fees for Return, Void
> Sales, Void Return, and/or Void Ticket Only transactions and
> (b) AVS Fees in connection with Return, Ticket Only, Void Sales,
> Void Return, and Void Ticket Only transactions.

> Contested SubClass 2: All Merchants nationwide who
> were parties to a Merchant Processing Agreement with FDMS and
> Wells Fargo from September 28, 2005 to the present that provided
> for the assessment of Authorization and/or AVS Fees, who
> submitted transactions to FDMS's Omaha Platform and were
> charged (a) Authorization and Capture Transaction Fees for
> Return, Void sales, Void Return, and/or Void Ticket Only
> transactions and (b) AVS Fees in connection with Return, Ticket
> Only, Void Sales, Void Return, and Void Ticket Only transactions.

By making this modification, the Court has made it so membership in these subclasses rests not

on whether a Merchant was charged excessive fees, which remains an unresolved and disputed

issue, but instead on whether a Merchant was charged (1) Authorization and Capture Transaction

Fees for Return, Void sales, Void Return, and/or Void Ticket Only transactions and (2) AVS

Fees in connection with Return, Ticket Only, Void Sales, Void Return, and Void Ticket Only

transactions.

## C. As to Whether the Plaintiff's Motion for Class Certification Satisfies Fed. R. Civ. P. 23

Although the Plaintiff's subclass definitions may be modified in order to avoid the fail-

safe problem, the Court nevertheless finds that the Plaintiff has failed to satisfy all four

requirements under Rule 23(a), as well as both of Rule 23(b)'s requirements.  In particular, as the Court will explain in greater detail below, the Plaintiff's motion fails with respect to numerosity, commonality and predominance.  Therefore, the Court denies the Plaintiff's motion for class certification.

### 1.  Numerosity

To begin, in this case, the Plaintiff asserts that numerosity has been met, because the class is more than 30,000 Merchants. The Plaintiff bases this figure on factors including (1) the almost 30,000 Merchants who processed transactions on the Omaha Platform who experienced one month during which the number of Authorization and Capture Transaction fees they were charged were at least double the amount of Sale transactions they completed; (2) the presumption that Merchants were overcharged if the number of Authorization and Capture Transaction fees they were charged was more than 115 percent the number of Sale transactions they completed in a particular month; (3) the suggestions by FDMS representatives that they often encountered overcharge complaints concerning Merchants using Authorize.net as their gateway; (4) the 13,456 distinct Merchants who accessed the Omaha Platform in December of 2010 alone; (5) the at least 500 Merchants who process or processed on the Omaha Platform under Merchant Processing Agreements similar to the Subject Agreement; (6) the 66,884 Ticket Only transaction requests and 240,309 other non-authorization transaction requests that FDMS processed on behalf of Merchants on the Omaha Platform in January of 2011; (7) FDMS's response to the Plaintiff's first set of interrogatories in which it acknowledges that at least 500 Merchants used the Omaha Platform and had entered into a Merchant Processing Agreement that was the same or substantially similar to the Subject Agreement; (8) FDMS's production of at least thirty-six form Merchant Processing Agreements containing language identical or similar to the Subject

Agreement with respect to charging Authorization and Capture Transaction fees on a per item basis and for Authorizations in general; (9) emails from ISOs concerning the number of Merchants who were moved from the Omaha Platform to the Nashville Platform in response to the alleged extra fees; and (10) the 13,456 Merchants who submitted transaction requests to the Omaha Platform using Authorize.net as their gateway during the last week of December 2011.

On the other hand, the Defendants claim that no more than fifteen merchants were impacted by what the Plaintiff describes as "over-charging." The Defendants' estimate is based upon (1) the testimony of Authorize.net's corporate designee that only three to six merchants complained about issues similar to the ones complained of by the Plaintiff; (2) the testimony of CoCard that it only moved five to ten Merchants from the Omaha Platform to the Nashville Platform in order to address the issue that the Plaintiff experienced; (3) the testimony of Triplett, an FDMS employee since 2001, that only six to ten Merchants faced the issue that confronted the Plaintiff; (4) the testimony of Scott MacNaughton, an FDMS employee from 1995, that only ten to fifteen Merchants complained about the issue complained of by the Plaintiff; and (5) the testimony of Rick Learch, an employee of FDMS since 1985, that he was unaware of any other Merchants experiencing the same issue that the Plaintiff faced.

After reviewing the evidence, in the Court's view, the Plaintiff's estimate concerning the size of the Class is speculative. For example, the Plaintiff argues that the numerosity requirement of Fed. R. Civ. P. 23(a)(1) has been satisfied based in part on the Defendants' admission that at least 500 Merchants had their requests processed on the Omaha Platform under Merchant Processing Agreements that were substantively the same as the Subject Agreement. The Plaintiff also points to FDMS's production of at least thirty-six form Merchant Processing Agreements containing language identical or similar to the Subject Agreement with respect to

charging Authorization and Capture Transaction fees on a per item basis and for Authorizations in general. However, just because these Merchants used the Omaha Platform or may have entered into Merchant Processing Agreements similar to the Subject Agreement does not necessarily mean that these other Merchants encountered issues similar to the Plaintiff. These Merchant could have been using different gateways other than Authorize.net to submit their processing requests. Further, even if they were using Authorize.net, they may not have enrolled in the Advanced Fraud Detection Suite, which appears to be responsible for generating the Plaintiff's separate Authorization Only transaction requests and Ticket Only transaction requests.

In similar fashion, the Plaintiff also relies on the large number of Merchants who processed transactions on the Omaha Platform during which the number of Authorization and Capture Transaction fees they were charged were at least double the amount of Sales transactions they completed. Therefore, the Plaintiff suggests that these Merchants must have been overcharged because they were charged more than 115 percent of the amount of sales they completed. Again, the Court finds the Plaintiff's position to be speculative. Indeed, the Plaintiff fails to take into account that these Merchants may have (1) entered into Merchant Processing Agreements that differ significantly from the Subject Agreement; (2) been using gateways other than Authorize.net; (3) not enrolled in the Advanced Fraud Detection Suite, even if they were using Authorize.net as their gateway; and (4) made certain business decisions which resulted in the larger ratio of Authorization Capture Transaction fees charged to Sale transactions completed.

In Pagan v. Abbott Laboratories, Inc., 287 F.R.D. 139 (E.D.N.Y. 2012) (Spatt, J.), this Court previously determined that the failure to affirmatively demonstrate numerosity is fatal to a plaintiff's motion for class certification under Fed. R. Civ. P. 23. In that case, the plaintiffs

brought a products liability claim and sought to certify a class of residents from New York and New Hampshire who had purchased allegedly defective baby formula that had been recalled by the defendant. The plaintiffs argued that they had established numerosity because "182,092 end-consumer recall-notification letters were mailed between September 24, 2010 and November 30, 2010, to residential addresses in the state of New York and 16,893 end-consumer recall-notification letters were mailed between September 25, 2010 and November 20, 2010 to residential addresses in the state of New Hampshire." Id. at 147 (citation and internal quotation marks omitted).

However, the Court found this insufficient, because the receipt of a recall-notification letter did not mean that the recipient purchased the defendant's allegedly defective baby formula or even purchased any of the baby formula from the defendant at all, since "many recipients of the recall-notification letters had actually received free samples of [the baby formula], and thus were not purchasers." Id. at 147. Therefore, the Court held as follows: "While the Court may make reasonable inferences from available facts, the [p]laintiffs here have provided no specific evidence to allow the Court to do so. Accordingly, as the [p]laintiffs' 'assertion of numerosity is based on pure speculation [and] bare allegations, the motion for class certification fails.'" Id. at 147–48 (quoting Lewis v. Nat'l Fin. Sys., Civil Action No. 06–1308(DRH)(ARL), 2007 WL 2455130, at *8 (E.D.N.Y. Aug. 23, 2007)).

The Court finds that the reasoning set forth in Pagan applies in this case. Similar to the plaintiffs in Pagan, the Plaintiff in this case attempts to establish numerosity through evidence that is over-inclusive and which does not acknowledge that many of the Merchants that the Plaintiff assumes would be Class members might not actually share the Plaintiff's breach of contract claim for the host of reasons articulated above. Instead, in order to demonstrate

numerosity, the Plaintiff needed to proffer evidence showing that a sufficient number of other Merchants (1) had Merchant Processing Agreements substantively the same as the Plaintiff's Subject Agreement *and* (2) experienced an injury similar to the Plaintiff's alleged injury while using the Omaha Platform.  As the Plaintiff has not done so here, the Plaintiff has not established the necessary element of numerosity.

### 2. Commonality

Even assuming that the Plaintiff had met Rule 23(a)(1)'s numerosity requirement, the Plaintiff's motion for class certification would still fail, because the Plaintiff has not satisfied the commonality requirement of Rule 23(a)(2).

In this regard, the Plaintiff seeks to certify four subclasses who were either parties to a Merchant Processing Agreement with FDMS or a Merchant Processing Agreement with FDMS and Wells Fargo that provided for the assessment of Authorization fees in general and/or AVS fees.  Thus, according to the Plaintiff, the commonality requirement of Fed. R. Civ. P. 23 (a)(2) is met because the Class members all entered into Merchant Processing Agreements which had "functionally identical language" concerning the fees to be charged and which were governed by the laws of the state of New York.  (Pl. Mem., pg. 28.)  The Plaintiff also contends that the question of how to interpret the phrase "per item," which is used in the Subject Agreement with respect to the Authorization and Capture Transaction fees and the AVS fees, is a common question to all the Class members and, once resolved, will result in common answers.

In addition, the Plaintiff identifies a number of supposedly common facts that it claims predominates over all individual issues.  These purported common facts include the following: (1) the Merchants submitted their processing requests on the Omaha Platform; (2) the ratio of Authorization and Capture Transaction fees and AVS fees charged to completed Sale

transactions should be 115 percent; (3) the Omaha Platform allegedly charged Merchants

Authorization and Capture Transaction fees and/or AVS fees for their Ticket Only and other

non-authorization and non-AVS requests; (4) FDMS allegedly overcharged Merchants because

the Omaha Platform was improperly programmed to charge Authorization and Capture

Transaction fees whenever a Merchant communicated with the Omaha Platform, regardless of

what type of processing service the Merchant was requesting; and (5) FDMS allegedly charged

Merchants Authorization and Capture Transaction fees for Return, Void Sale, Void Return and

Void Ticket Only transaction requests even though no authorizations are performed in

connection with these requests.

However, despite the Plaintiff's contentions, the Court finds that the Plaintiff has not

demonstrated that all the Merchants who would be members of the proposed Class have actually

entered into substantively similar Merchant Processing Agreements with FDMS or with FDMS

and Wells Fargo. In fact, the evidence before the Court indicates that these Merchant Processing

Agreements can vary in material ways, particularly with respect to the language concerning how

fees will be assessed. In this regard, with respect to Authorizations, some Merchant Processing

Agreements provide for an assessment of a "Transaction fee" rather than an "Authorization and

Capture Transaction fee" on a per item basis. Other Merchant Processing Agreements stipulate

that fees will be paid on a per trans/communication basis.

Nevertheless, the definitions for all four subclasses include Merchants who executed

Merchant Processing Agreements that provide for "the assessment of Authorization fees and/or

AVS fees" without any caveats. Thus, if the Plaintiff's motion were to be granted, the Court

would likely be confronted with a Class consisting of Merchants who actually agreed to different

terms concerning the basis by which these fees should be assessed. Therefore, in the Court's

view, "[t]he commonality requirement is [ ] not satisfied as the [P]laintiff cannot advance a collective breach of contract action on the basis of multiple contracts." <u>Jim Ball Pontiac-Buick-GMC, Inc. v. DHL Exp. (USA), Inc.</u>, 08-CV-761C, 2011 WL 815209, at *4 (W.D.N.Y. Mar. 2, 2011) (citation and internal quotation marks omitted).

While the Court could potentially modify the subclass definitions to eliminate this over-inclusivity, the Court finds that additional hurdles exist for the Plaintiff with respect to establishing the commonality prong. For instance, the Court finds that the Plaintiff has failed to demonstrate that there has been an injury common to all potential Class members. While the Plaintiff extensively discusses its own injury as a result of FDMS's alleged overcharging, it highlights no similar examples with respect to other Merchants. Instead, the Plaintiff apparently speculates that because a Merchant was processing on the Omaha Platform, it too must have been charged the same Authorization and Capture Transaction fee and/or AVS fee twice for the identical Sale transaction – that is, once for the Authorization transaction request and a second time for the Ticket Only transaction request – in alleged violation of the terms of its Merchant Processing Agreement.

Further, the Court disagrees with the Plaintiff's assertion that factual variances between the Plaintiff and the proposed Class members, such as the involvement of different ISOs and use of gateways other than Authorize.net, are inconsequential. These factual variances may impact whether a Merchant negotiated with its ISO any terms in its Merchant Processing Agreement and how a Merchant understood the terms in its Merchant Processing Agreement based on the explanations it received from its ISO. In turn, these factors would require the Court to conduct individual evaluations in the event the Court determines the terms of the Merchant Processing Agreements are ambiguous. Moreover, which ISO a Merchant worked with could affect whether

it was billed for a certain communications or transaction requests it submitted, while which gateway a Merchant used could affect how the Merchant submitted its transaction requests to the Omaha Platform.  As such, other Merchants may not have experienced the same alleged injury as the Plaintiff.

Accordingly, because the Merchant Processing Agreements can differ with respect to how fees are charged and because there is no proof of common injury, the commonality requirement of Fed. R. Civ. P. 23(a)(2) is not met.

### 3. Predominance

The Plaintiff also fails to meet the predominance requirement of Fed. R. Civ. P. 23(b)(3) for substantially the same reasons it fails to satisfy the commonality requirement.  In this regard, "courts properly refuse to certify breach of contract class actions where the claims require examination of individual contract language."  In re U.S. Foodservice Inc. Pricing Litig., 729 F.3d 108, 124 (2d Cir. 2013).  For example, in Spencer v. Hartford Financial Services Group, Inc., 256 F.R.D. 284 (D. Conn. 2009), the plaintiffs brought a breach of contract claim on behalf of "a class of individuals whose settlement agreements state[d] the total cost or value of the settlement, or the cost or value of the portion being structured."  Id. at 303.  However, the defendants "dispute[d] that the agreements [were] themselves materially uniform, pointing to the variance in terms and the different meanings of 'cost,' 'value,' and 'present value.'"  Id.

After "review[ing] many of the agreements," the Spencer court "determined that, while they do exhibit patterns to some extent, [the agreements] [were] not sufficiently uniform to allow common issues to predominate in a class-wide breach of contract action involving over two thousand contracts."  Id. at 303–04.  The court reasoned that "[t]he contracts simply exhibit[ed]

too much variation to permit common issues to predominate over individual issues on the breach of contract claim." Id. at 304.

The Court finds this reasoning to be applicable in this case. While it appears that the terms of the Merchant Processing Agreements may overlap, the Court cannot ignore the significant variations in the way these Merchant Processing Agreements stipulate which fees will be charged and on whether these fees will be assessed on a per item, per transaction or some other basis. Indeed, a critical question in the Plaintiff's case is how the Subject Agreement's use of the phrase "per item" should be interpreted in order to determine whether the proper amount of AVS fees and Authorization and Capture Transaction fees were assessed. Not all of the Merchant Processing Agreements contain this language, and the Court will be called on to make individual interpretations based on the different phrases and language used in the various Merchant Processing Agreements.

Therefore, since individual questions clearly predominate over common questions, the Plaintiff fails to meet the predominance requirement and class certification pursuant to Fed. R. Civ. P. 23 is inappropriate in this case. As such, the Court denies the Plaintiff's motion for class certification on this basis as well.

**D.  As to Whether the Court May Still Exercise Jurisdiction Over This Case**

The Court has declined to grant the Plaintiff's motion to certify a class. Due to this ruling, the Court must now confront the question of whether it may still exercise jurisdiction over this action. This Court has already indicated that when a "[p]laintiff's motion for class certification must be denied, [the] [p]laintiff's action is no longer a class action, and [the] [c]ourt cannot retain subject matter jurisdiction in diversity over [th]e [p]laintiff's action pursuant to the Class Action Fairness Act." McGaughey, 2007 WL 24935, at *3 (S.D.N.Y. Jan. 4, 2007).

Accordingly, in this case "[b]ecause the Court denied [the] Plaintiff['s] motion for class certification, [the] Plaintiff[ ] must now establish the Court's diversity jurisdiction over their state law claims." Nash v. The New School, No. 05 Civ. 7174(KMW)(FM), 2009 WL 1159166, at *1 n.4 (S.D.N.Y. Apr. 29, 2009).

However, as previously discussed, complete diversity does not exist in this case, since both the Plaintiff and the Defendant FDMS are citizens of Florida. Accordingly the Court cannot exercise subject matter jurisdiction over the Plaintiff's individual action under the general federal diversity statute of 28 U.S.C. § 1332. Heinonen v. Cramer & Anderson LLP, 3:13-CV-00459 VLB, 2013 WL 6773641, at *10 (D. Conn. Dec. 20, 2013)("For a case to be diverse, there must be complete diversity of parties; 'diversity is not complete if any plaintiff is a citizen of the same state as any defendant.'") (quoting St. Paul Fire & Marine Ins. Co. v. Universal Builders Supply, 409 F.3d 73, 80 (2d Cir.2005)) (internal brackets omitted). Consequently, the Court has no choice but to dismiss the Plaintiff's complaint without prejudice for lack of subject matter jurisdiction. McGaughey, 2007 WL 24935, at *3 ("Because denial of class certification leaves this Court without subject matter jurisdiction, the complaint is dismissed.").

### III.    CONCLUSION

For the foregoing reasons, it is hereby:

**ORDERED** that the Plaintiff's motion to certify a class pursuant to Fed. R. Civ. P. 23 is denied; and it is further

**ORDERED** that this case is dismissed without prejudice for lack of subject matter jurisdiction. The Clerk of the Court is directed to close this case.

**SO ORDERED.**
Dated: February 22, 2014                    ____/s/ Arthur D. Spatt_____
                                            ARTHUR D. SPATT
                                            United States District Judge